In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00288-CV
_____

IN THE INTEREST OF A.E.M., J.M.M. AND K.J.M.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 10-11-12290-CV

**MEMORANDUM OPINION**

Appellant Mother appeals a modification order appointing Father as sole managing conservator of their children A.E.M. (fifteen years old), J.M.M. (thirteen years old), and K.J.M. (eleven years old), and appointing Mother as possessory conservator.[1] We affirm.

---

[1] To protect the privacy of the parties, we use the children's initials and refer to certain other individuals by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

1

Background[2]

Mother and Father divorced on July 7, 2011, and the agreed final divorce decree appointed Mother and Father joint managing conservators of their children. On February 25, 2014, an Agreed Order in Suit to Modify Parent-Child Relationship was signed and Mother and Father remained joint managing conservators of the children. On January 10, 2017, an Agreed Order in Suit for Modification of Support Order and to Confirm Support Arrearage was entered.

On July 21, 2017, Father filed a Petition to Modify Parent-Child Relationship seeking the right to determine the primary residence of the children, a modification of the rights and duties of the parties, and a request that his child support obligation be modified. Mother was served with the petition on or about August 7, 2017. On October 5, 2017, the trial court signed a default Order in Suit to Modify Parent-Child Relationship, which was later set aside on Mother's Motion to Set Aside Default Judgment.

On October 30, 2017, Father filed a Petition to Modify Parent-Child Relationship. On November 14, 2017, the trial court signed Interim Temporary

_____

[2] The parties only designated part of the record below for inclusion in the appellate record. Some background information is included in the trial court's findings of fact, and the background information is not challenged or disputed by the parties on appeal.

2

Orders ordering that Father have possession of the children for certain periods in November and then possession of A.E.M. and J.M.M. continuing until additional orders were agreed upon or upon further order of the court. The Interim Temporary Orders ordered that Mother have the children during certain periods of the remainder of November and then that Mother have possession of K.J.M. continuing until additional orders were entered.

On November 22, 2017, Father filed his First Amended Petition to Modify Parent-Child Relationship. In Father's petition, he alleged that A.E.M. and J.M.M. are twelve years or older and "will express to the Court in chambers, as provided in section 153.009 of the Texas Family Code, the name of the person who is the children's preference to have the exclusive right to designate the primary residence of the children." Father requested that the terms and conditions for access to or possession of the children be modified by designating Father as the sole managing conservator for all three children and suspending Mother's possession and access with the children and thereafter that her possession of and visitation with the children be supervised by Access Builds Children or other facility as designated by the trial court. Father alleged that Mother "has a history or pattern of child neglect directed against the children[,]" and Father requested that the trial court deny Mother access to the children, or in the alternative, that the court render a possession order that

3

provides Mother with periods of supervised visitation. Father requested that the injunctions against him granted in the February 2014 order be removed. Father further requested that he, exclusively, be awarded the following rights: to consent to medical, dental, and surgical treatment involving invasive procedures; to consent to psychiatric and psychological treatment of the children; to make educational decisions on behalf of the children; and to receive and give receipt for periodic payments for the support of the children and to hold and disburse any funds for the benefit of the children. Father alleged that the requested modification is in the children's best interest and he requested attorney's fees. Father also requested temporary orders consistent with the requests for relief noted above. Father attached his own affidavit to the petition and asserted that the temporary orders were in the children's best interest and were necessary because the children's present circumstances would significantly impair the children's physical health or emotional development.

On December 11, 2017, the trial court signed additional interim temporary orders and signed an agreed order appointing Laura Watson as Amicus Attorney to protect the best interests of the children. On February 21, 2018, Mother filed a Counter-Petition to Modify Parent-Child Relationship and sought to modify the July 7, 2011 Agreed Decree of Divorce, the February 25, 2014 Agreed Order on Suit to

Modify Parent-Child Relationship, and the October 5, 2017 Order in Suit to Modify Parent-Child Relationship. In her counter-petition, Mother alleged a material and substantial change in circumstances had occurred since the prior order, she requested that she be appointed the person who has the right to designate the children's primary residence, she asked that Father be denied access to the children or be ordered to have supervised periods of possession, she requested that child support be increased and temporary orders be entered. On June 14, 2018, Father filed his Second Amended Petition to Modify Parent-Child Relationship, which sought the same relief as his prior petition but added a request that the trial court order Mother to pay child support. A bench trial occurred on June 26-28, 2018.

On June 28, 2018, the trial court announced its ruling and then signed the written order on July 6, 2018. The trial court denied Mother's counter-petition, appointed Father as the sole managing conservator and Mother as the possessory conservator, awarded Mother a standard possession order with elections, restricted the children's residence to Montgomery County and contiguous counties, ordered Father to continue to maintain health insurance for the children, modified some of the pre-existing injunctions, ordered Mother to pay child support, ordered the parties to pay their own attorney's fees, and granted the amicus attorney's request for attorney's fees. Upon Mother's request, the trial court filed Original Findings of Fact

and Conclusions of Law and Supplemental Findings of Fact and Conclusions of Law. The trial court included the following conclusions in its conclusions of law:

[] The Court finds that a material and substantial change has occurred.

[] The Court finds that appointment of the parties as joint managing conservators is not in the best interest of the children.

[] The Court finds that it is in the best interest of [A.E.M., J.M.M., and K.J.M.] for [Father] to be appointed Sole Managing Conservator of the children and [Mother] to be appointed Possessory Conservator.

[] The Court finds that a Standard Possession Order for [Mother] is in the best interest of the children.

. . . .

[] The Court finds that it is in the best interest of the children for [Mother]'s Counterpetition to Modify the Parent-Child Relationship to be denied in its entirety.

. . . .

[] The material allegations in [Father]'s Second Amended Petition to Modify Parent-Child Relationship are true.

[Father]'s requested modification is in the best interest of the children[.]

Mother appealed. Mother argues (1) the trial court abused its discretion in designating Appellee sole managing conservator due to his documented history of domestic violence; (2) the trial court abused its discretion by modifying the existing order because evidence did not demonstrate a material and substantial change in circumstances since the prior order; (3) the trial court abused its discretion when it

denied Appellant's motion for continuance; and (4) the trial court abused its discretion when it improperly admitted Petitioner's Exhibit 6. We affirm.

Evidence Presented at Trial

<u>Shelby Smith</u>

Shelby Smith testified that she is the principal at K.J.M.'s elementary school and she first met K.J.M. after she became principal of his school in February 2018. Smith testified that K.J.M. "was on the list for excessive absences[.]" According to Smith, records from the school indicated that K.J.M. had been absent from school thirty-one days out of the ninety-eight days of school since his enrollment in November 2017. Smith testified that K.J.M.'s attendance rate of "just over 30 percent" concerned her because "[s]tate law requires a student [be] in attendance 90 percent of the time . . . if they're enrolled on the first day of school[.]" Smith testified that in April, the school had been notified that K.J.M. had been out of town and after almost ten consecutive absences Smith called Mother, K.J.M.'s stepfather, and K.J.M.'s grandmother, but could not get in touch with anyone. After daily attempts to get in touch with the family, Smith asked district police to do a welfare check, but the officer was unable to get anyone to answer at Mother's house. Smith communicated to Mother that K.J.M. needed to attend school in order to progress

7

academically. According to Smith, Mother was served citation for "contributing to nonattendance" by a district police officer because K.J.M. resided with Mother.

Smith acknowledged that K.J.M had been in attendance during summer school and had shown improvement, but Smith stated that based on past patterns she still had concerns about whether K.J.M. would continue to attend. Smith testified that on more than one occasion Mother inquired as to what contact the school was having with Father, that Mother told Smith on a couple of occasions that Father was not allowed to be at the school, that Smith told Mother she would need to provide the school something in writing in order to limit Father's access to the child, and that Mother never provided such documentation to her.

Smith testified that K.J.M. had three failing averages in three subjects for the year and he had to attend summer school to advance to the fifth grade "for attendance and for academic purposes." According to Smith, K.J.M. should be going into sixth grade based on his age. Smith testified that K.J.M. was absent for the writing portion of the STAAR test, passed the reading STAAR, but failed the math STAAR. Smith testified that she has been in contact with the amicus attorney regarding K.J.M.'s attendance and performance on tests.

Smith testified that she communicated with Father about K.J.M.'s attendance and that Father would check with the school on occasion to make sure K.J.M. was

8

attending. On one occasion, Father requested a conference to talk about K.J.M.'s absences and his academics. Smith testified that at the meeting she informed Father that K.J.M.'s attendance was affecting his academics and that he was "significantly behind in grade level because of the absences and because he was in homeschool prior to enrolling[.]"According to Smith, there was nothing about Father's contact with her that was inappropriate or caused her concern.

Theresa Burbank

Theresa Burbank testified that she is the therapist for the family, particularly for A.E.M. and K.J.M. Burbank testified that because J.M.M. is autistic, Burbank suggested that Father contact his insurance company and find a therapist that specializes with autism. She testified that she began working with A.E.M. and K.J.M. in December 2017. According to Burbank, she had thirteen individual sessions with A.E.M., two family sessions between A.E.M. and Mother, and six sessions with K.J.M.

Burbank testified that A.E.M. is progressing while living with Father but has "a lot of sadness and anxiety" because she misses Mother. Burbank testified that she suggested A.E.M. continue individual therapy and have family sessions between A.E.M. and Mother at least twice a month. Burbank testified that A.E.M. has made progress through her counseling, has successfully attended individual therapy, and

9

that Father brought A.E.M. to the sessions. Burbank testified that the joint sessions with A.E.M. and Mother "went really well[]" and "[b]oth of them expressed a desire to have a relationship[.]" Burbank explained that since January she has been able to have only two family sessions between A.E.M. and Mother because Mother either has texted Burbank to cancel the session or failed to attend the scheduled sessions. Burbank testified that when Mother failed to show, A.E.M. became "very emotional [and] crie[d]." According to Burbank, Mother explained to Burbank that she chose not to attend the joint sessions with A.E.M. because Mother "believes that until [A.E.M.] tells the truth and acknowledges that she has lied to the Court, that she is putting herself at risk if she attends those sessions."

Burbank testified that based on her sessions with K.J.M. from December 12 to March 28, Burbank had concerns for K.J.M. because he was anxious at times and "was experiencing a tremendous amount of grief due to the family changes, and in addition, there was a lot of stress[.]" Burbank testified that she requested to have joint sessions between K.J.M. and Father but never was able to have a joint session because Mother would "text[] again cancelling for various reasons[] and there were no-shows[.]" According to Burbank, Mother expressed to Burbank that she was concerned that K.J.M was scared of Father and did not want to be in his presence. Burbank testified that on March 28, Father brought K.J.M. to Burbank's office for a

10

therapy session and K.J.M. appeared excited to be with Father. Burbank testified that K.J.M. was "hugging his father[,] laughing[,] joking and very engaged with his father as well." After March 28, Burbank "reach[ed] out to [Mother] on one other occasion to set up another session not only for [K.J.M.] but a session for she and [A.E.M.,]" but Mother never responded. According to Burbank, Mother has not contacted her to schedule any additional appointments. According to Burbank, Mother told Burbank that she is a victim of family violence and that she is afraid of Father.

Father

Father testified that, at the time of trial, A.E.M., J.M.M., and K.J.M. were fifteen years old, thirteen years old, and eleven years old, respectively. According to Father, he and Mother were divorced in 2011 and the divorce decree was modified in 2014. Father testified that he believes the circumstances for the children have changed since the last order that was entered in February 2014. Father testified that prior to filing the current lawsuit, he had concerns about the children's well-being, A.E.M.'s education and emotional state, J.M.M.'s autism and behavior, and K.J.M.'s "nonexistent[]" education. Father testified that since 2014 he had expressed his opinion on multiple occasions that the children should be enrolled in school because their homeschooling was "so irregular[,]" one of his biggest concerns precipitating

11

the lawsuit was "they weren't being schooled whatsoever[,]" and he wants his children to have an education and progress in society. Father testified that because of the orders that were in place he could not enroll the children in school and was limited to voicing his concerns. Father also testified that prior to the lawsuit he had concerns about the medicine J.M.M. was taking because he was getting "worse[,]" and Father discussed these concerns with "the mother and the grandparents[.]"

Father testified he initially filed the lawsuit in July 2017 and obtained custody of all three children. According to Father, no one answered the door at Mother's house when he tried to pick up the children after the court order, and ultimately Father found Mother at a hotel room and a constable helped Father take possession of the children. Father testified that the following weekend for Mother's visitation period, the two oldest children did not want to go with Mother, but K.J.M. did go with Mother. Father testified that Mother never returned K.J.M. to him after that weekend visit. Father also testified that he was not able to have his visitation over Thanksgiving 2017 with K.J.M. as provided for in interim temporary orders because attempts to exchange the children were unsuccessful. Father testified that he and Mother agreed that on March 28th he would bring A.E.M. and Mother would bring K.J.M., and they would meet at the pre-arranged location and exchange the children for a three-hour visit wherever they wanted. Father testified that he arrived at the

location on time, but Mother and K.J.M. arrived an hour and a half late. He bought food for K.J.M. and then took K.J.M. to have a thirty-minute therapy session with Theresa Burbank. According to Father, he wanted to spend most of the allotted visitation time with K.J.M. because he had not had a one-on-one visit with him, and he was trying to rebuild their relationship. Father described K.J.M.'s demeanor during the visit as "great[]" and they were "joking and laughing[.]" Father testified that when he arrived at the same location at the pre-arranged time three hours later, Mother was not there with A.E.M., he called A.E.M. who told him they were at the mall, and Father went to the mall to exchange the children back.

According to Father, he reached out to Mother multiple other times to try to exchange the children for visitation. Father testified that he reached out to Mother about the children visiting Mother on Mother's Day because "[i]t's important that my kids have a relationship with their mom[,]" but ultimately Mother did not make arrangements to see them on Mother's Day. Father testified that Mother did not reach out to him to attempt for him to see the children during Father's Day weekend. Father testified that Exhibit P-6 reflected text messages between Father and Mother discussing attempts to exchange the children during the Thanksgiving possession period.

Father testified that A.E.M. was not enrolled in school prior to the 2017 suit. According to Father, A.E.M. has been enrolled in high school since October 2017, and she is "thriving in school." Father testified that initially school personnel told him they determined A.E.M. should be in eighth grade but that he wanted her to be in the ninth grade with her age group, and that he thought with tutoring she could stay with her age group. According to Father, he tried to ease the transition to school for A.E.M. by discussing with her "how school is and then also interactions with kids . . . and just teaching her some things that she's just never been a part of." Father testified that he had her go to tutoring multiple times to ease the academic transition, that A.E.M. often initiates the tutoring, and that A.E.M. passed her classes and did not have to attend summer school. Father testified that he discusses with A.E.M. that he wants her to have a relationship with Mother. Father acknowledged that A.E.M. has a cell phone and it allows for open communication with Mother, and according to Father, he has never blocked Mother's number from A.E.M.'s phone. Father testified that on multiple occasions he took A.E.M. for visitation with Mother and when Mother "didn't show up five or six times[,]" it would upset A.E.M. Father testified he takes A.E.M. to counseling, and that even though at the time of trial Mother had the right to make medical and dental decisions involving invasive procedures for the children, Father has concerns with Mother's ability to do so

14

because Mother "doesn't take them to the doctor to tend to their needs[]" and Father "always had to do it[]" since 2014.

Father testified that J.M.M. was not enrolled in school prior to the 2017 suit, and Father did not have any knowledge of J.M.M. being involved with any programs assisting him with his autism from 2014 until this suit was filed. Father testified that although he got possession of J.M.M. in October 2017 and then enrolled him in middle school, "[i]t took a couple of weeks for [J.M.M.] to get -- for the teacher to be with him, and at the ARD meeting -- once the ARD meeting was set up and they knew exactly what his needs were, that's when they set up his IEP program . . . where they could better help his situation." Father explained that the IEP program is an individualized program for J.M.M. with his autism and "he has multiple teachers that address each area that he needs to have help in." According to Father, J.M.M.'s ability to listen, ability to follow directions, participation in school, and his grades have improved since he has participated in the IEP program. Father testified that he has taken J.M.M. to a specialist that was suggested by J.M.M.'s doctor. Father testified that the biggest change in J.M.M.'s demeanor since October 2017 when Father obtained possession is J.M.M.'s ability to communicate. According to Father, J.M.M. "went from not speaking verbally, talking to other people, making eye contact to conversations, like actual lengthy conversations. . . . When it comes to

touching, it's -- it's a big deal. Now he is giving kids high five in school[.]" As for changes in J.M.M.'s behavior, Father testified that J.M.M. has had "tremendous improvement" and "went from acting out, seeing what he could get away with, to actually . . . listening . . . to kids." According to Father, he e-mailed Mother regarding J.M.M.'s then upcoming ARD meeting, and Father attended but Mother did not. Father testified that he never provided anything to the school stating that Mother could not access information about either A.E.M. or J.M.M.

Father testified that in October 2017 he also enrolled K.J.M. in school but that K.J.M. did not start attending then. According to Father, at the time of trial K.J.M. was attending a different elementary school, and Father was concerned about his progress in school because "[h]is attendance is a huge issue and also his grades." Father testified that he spoke to K.J.M.'s principal multiple times regarding K.J.M.'s attendance and called the school administration to see if K.J.M. was in school until it was set up where Father could access attendance records online. Father testified that if the court was to switch custody of K.J.M. to Father for primary possession, he had already met with the teachers at the new school K.J.M. would be attending and discussed with them how to get him caught up to his grade level. According to Father, K.J.M. was in summer school because he had failed fourth grade, and the goal for summer school was to enable K.J.M. to proceed to fifth grade the following

year. Father testified that under the current court orders Mother has the right to make educational decisions regarding the children, which concerns Father because K.J.M. "has already missed 30-something days of school, and . . . he was not even put into school until late November."

Father testified that, since the divorce with Mother, he has been married and divorced to another woman. According to Father, since 2014 he has not used corporal punishment to discipline any of the children, and from 2014 to the initiation of this lawsuit Mother has never contacted him expressing concerns that he was "beating the children[.]"

Father explained that he wants the trial court to modify the terms of the order in place, give him the exclusive right to determine the children's primary residence and all rights and duties relating to the children, order Mother to pay him child support, and order that Mother have supervised visits because Mother has not given K.J.M. back and Father is afraid that Mother would not give the children back if visits were unsupervised. Father testified that his plans for A.E.M. are for her to attend high school and then go to college, and that A.E.M. wants to be a veterinarian and Father's goal is to help her obtain that career. As to J.M.M., Father testified that he wants J.M.M. to attend school as long as possible so that J.M.M. can gain the

necessary skills to become independent. According to Father, he also wants to help K.J.M. with his aspirations to go to college.

Father admitted that he was arrested for possession of cocaine when he was eighteen years old. He acknowledged he was arrested for family violence assault in 2011 or 2012, and he pleaded guilty to the offense, which resulted in the 2012 protective order. He testified he was arrested in 2013 for driving while intoxicated and received probation. He denied that he currently drinks alcohol. According to Father, since he and Mother divorced he has not told Mother that he wants to have sex with her, tried to kiss her in front of the children, threatened to beat up Mother's husband, or told Mother that he "will make you disappear off the face of the [E]arth." Father testified that he never received an ex parte protective order from Montgomery County but did receive one from Harris County.

Mother

Mother testified that she wants the trial court to order that she have custody of the children because they are in danger with Father. According to Mother, "[h]e is extremely abusive, and he has been since a couple of months after [she] married him." Mother testified that after A.E.M. was born, Mother was nursing her, Father got mad for a reason Mother could not remember, Mother tried to take A.E.M. next door to her mother's house and Father "grabbed [Mother] by [her] neck, and he

18

started choking [her]. . . . And as [she] was walking down the stairs . . . holding [A.E.M.]. . . is when he pushed [Mother] and [Mother] fell to the ground." Mother testified the abuse was "ongoing." Mother also testified that when J.M.M. was "maybe four years old," J.M.M. and K.J.M. were on the floor playing and J.M.M. took a toy away from K.J.M. and Father "jump[ed] up and he grabbed [J.M.M.] and he starts spanking him, and he hit him a couple of times, . . . and [J.M.M.] had [Father]'s handprint covered on his entire back." Mother testified that when she grabbed J.M.M. and took him into the bathroom, Father started chasing Mother down the hallway. According to Mother, on another occasion when J.M.M. was "around 2 1/2[,]" Father came home drunk and Mother told him not to hold K.J.M. because K.J.M. "was still young[,]" and Father got mad, called Mother names, took both boys into the bedroom, shut the door, and when Mother opened the door, Father was holding K.J.M., J.M.M. "somehow got his arm through the door[,]" and Father shut the door on J.M.M.'s arm.

According to Mother, since February of 2014 she and Father have had discussions where Father told her that she is "too easy" on the children and they need discipline, and Father called their boys wimps, said inappropriate things to her in front of the children, and said he was going to take the children away from her so Mother would come back to him. Mother testified that since 2014, Father had not

19

exercised Thursday visitation or birthday visitations, and although he would usually pick the children up from Friday to Sunday on a regular basis, "he was always trying to change it."

Mother testified that in October 2017 she filed for a protective order in Montgomery County because of "things [she] was told[]" and Father had told her around October 6th that "he was going to make [her] disappear off the face of the [E]arth." Mother testified that she did not have a lawyer at the time and she did not ever serve Father with that protective order. Mother testified that she filed for another protective order in Harris County and it was granted. According to Mother, she filed a motion to set aside the default in this matter and a hearing was set. Mother testified that she was "forced to drop" the existing protective order. According to Mother, she "want[ed] all three of them, but [Father] had a habeas corpus against [her,]" and she made an agreement to let Father have A.E.M. and J.M.M. so she could have K.J.M. and "could keep at least one kid safe from him." Mother testified she believes that if Father is allowed visitation with the children it should be supervised because he is physically, emotionally, and mentally abusive to the children. Mother testified that she saw J.M.M. in December 2017 and she was concerned because he "was extremely thin[]" and his feet smelled bad. She also was

concerned because Father did not tell her that A.E.M. had been suspended from school.

Regarding Exhibit P-6, admitted as a copy of printed texts between Father and Mother from Father's phone related to a scheduled exchange of the children at the police station, Mother testified that "a lot of it is missing." According to Mother, she was at the police station where she had agreed with Father to meet and that he was being controlling.

Mother testified she has been married to her current husband for seven years and that he has participated in some of the visitations with the children. Mother testified that Father has threatened to kill her husband, although she has not called the police regarding the threats.

When asked why K.J.M. missed so much school, Mother testified that "at first, . . . he had a problem with one of the teachers[]" and Mother e-mailed the teacher and talked with the principal and counselor. Mother agreed that K.J.M. "really wasn't used to school[]" and the situation improved. Mother testified that other reasons K.J.M. missed so much school was because he had the flu, he would get "viral infections, fever, sore throat, I guess, from being new to the school system[,]" and "he missed a little bit of a week" when they went to St. John.

According to Mother she has "looked into" the schools A.E.M. and J.M.M. would attend if she got primary custody. Mother testified that she would take the children to school and pick them up each day. Mother testified that it is important for J.M.M. to have his own room like he would have at her house because his autism causes him to become physical when he is upset and there could be a safety issue if he shared a room with K.J.M., and J.M.M.'s sensory processing disorder causes him to not like loud sounds or certain sounds and he likes the lights a certain way.

Mother testified that she does not go to therapy with K.J.M. because she does not have faith in Theresa Burbank. According to Mother, Burbank "did not speak up" for K.J.M. and was trying to get information for Father. Mother admitted that she had not taken K.J.M. back for his therapy sessions since March 28 when K.J.M. was to have a three-hour visit with Father and Father took him to Burbank for a therapy session. Mother agreed that she was first served with Father's lawsuit in July 2017 seeking custody of the children, but she did not appear in court for the temporary orders hearing. She also agreed that she filed a protective order in the same trial court but did not appear when the protective order was set for hearing. Mother conceded that on November 6, 2017, she nonsuited and did not have Father served with the protective order. Mother agreed that since 2011 she was the parent with the right to make psychiatric, psychological, and medical decisions for J.M.M.,

22

but has not had him evaluated by an autism specialist even though she thinks it would be important. Mother agreed that, despite her allegations that all three children have been subjected to Father's continuous violence, she agreed to a final decree of divorce with no finding of family violence and she agreed to Father being the children's joint managing conservator. She also agreed that since the order was modified in 2014, she and Father are still the children's joint managing conservators. Mother does not know what an IEP program is and was notified of one ARD meeting for J.M.M. but did not attend. Mother testified that prior to the modification suit being filed she had the exclusive right to make decisions regarding the children's education, homeschooled the three children together except for a few months when her mother homeschooled the children, and she agreed she had no specialized training in teaching an autistic child. Mother believes she should have the right to determine the children's primary residence. She agreed they should have a good education and that she did not meet the children's educational needs or provide them a good education when she was homeschooling them. Mother also agreed that since K.J.M. has been primarily in her possession since October 2017, he has failed three of his four subjects. She waited over a month after she had possession of him to enroll him in school. She conceded that his number of absences from November 2017 to May 2018 was not acceptable. According to Mother, she received truancy

23

paperwork but did not show up for the first truancy hearing. As to their vacation to St. John, Mother testified that she let K.J.M. miss school for the trip even though he was failing his classes because "[h]e desperately needed it." She knew the names of K.J.M.'s teachers, but she did not know the names of A.E.M.'s or J.M.M.'s teachers.

Mother testified that she works for Clayton Homes for fifteen dollars an hour but has not worked since the trial started. Mother testified that she has not attended the trial because she takes and picks K.J.M. up from summer school.

Mother testified that she should be named sole managing conservator of the children because she has concerns that, although she has never visited Father's house, J.M.M. "doesn't know the limits" with dogs and Father has a dog. Mother testified that she should be the children's primary custodian because she "would get them the right kind of psychiatric help that they need[,]" and "a parent's job is to raise your kids to . . . have an education and just to be good to other people." According to Mother, she should be the primary caretaker of J.M.M. because she's "the one who has taught him what he knows[]" and "[h]e needs someone that understands him." Mother testified that she wants A.E.M. back even though A.E.M does not want to live with Mother, and Mother believes A.E.M. needs help. Mother testified she did not attend arranged dinner visits with A.E.M. in March, April, May, and June, and did not attend the dinner visit with A.E.M. scheduled for A.E.M.'s

24

birthday. Mother never attended any parent-teacher conferences at A.E.M.'s school and, upon finding out that A.E.M. had been suspended from school, Mother did not go to A.E.M.'s school to talk with anyone. Mother testified that another reason she should be the children's primary caretaker is because on one of the three-hour arranged visitations, Father took K.J.M. somewhere without telling her and she thought the purpose of the visitation was for K.J.M and J.M.M. to spend time together. Mother testified that J.M.M. has a close attachment to K.J.M., and that even though K.J.M. is J.M.M.'s little brother, K.J.M. looks out for J.M.M. Mother believes K.J.M. is terrified of Father. Mother testified that "[i]f the Court gave me custody of my kids, I would sign something saying if they didn't get the proper education, I would sign over all my rights."

Heidi Bassett

Heidi Bassett, an instructional specialist with the Humble Independent School District, testified that she has thirty-four years of experience in special education and her primary role with the district the past few years has been working with students with autism. According to Bassett, she is "in and out of the classrooms providing support[]" and oversees the structure, activities, and curriculum of the specialized programs for students with autism. Bassett met J.M.M. when he enrolled in the sixth grade at a middle school in the district, and that he is enrolled in a program called

"SPEAK Transition[,]" which is developed specifically for the need of students with autism spectrum disorders. Bassett testified that the program is "based on a high level of structure, physical structure, very consistent routines. They incorporate sensory breaks . . . and many of the other best practices that we use when working with kids with autism." Bassett spends time in the classroom and partners with J.M.M.'s teacher and J.M.M.'s other service providers on campus, such as his speech therapist and school psychologist. Because J.M.M. is currently enrolled in the summer school program that she oversees, she now sees him four days a week. According to Bassett, the summer program has the same structure as during the school year because children with autism typically need to maintain structure and continuing to use the same strategies in the summer that resulted in progress during the year prevents students from regressing over the summer. Bassett explained that the program she oversees at Humble ISD allows children with disabilities to stay in the school district until age twenty-two if they still have goals and objectives to work on and the structure would depend on the individual student's needs.

Bassett has discussed with Father why the program was recommended for J.M.M. and explained that the emphasis in middle school and high school is to look at the skills and strategies that will support the students vocationally in the future with independent living, becoming an employee, and social skills. When asked

whether Father was receptive to supporting J.M.M. through this program, Bassett testified, "[a]bsolutely."

According to Bassett, when she initially observed J.M.M. in the classroom setting, she saw "what we would consider escape behaviors[]" and he would "bolt from the classroom, lay on the floor, refuse to -- engage in -- in the activities that the teacher and staff were asking him to do." She observed that he would at times not comply with tasks he was asked to do. Bassett testified that from the time she met J.M.M. to the end of the school year she "saw great changes" in his compliance and ability to independently access the school building and the different settings. J.M.M. improved his ability to follow directions and comply with tasks, such as reading out loud, which he initially refused to do. He has also improved his ability to work in groups, share an activity, take turns, wait for other people, and maneuver the school building. According to Bassett, J.M.M. reads on a second or third grade level and "can do some . . . higher level of math, probably not more than fourth, fifth grade[.]"

K.J.M. In-Chamber Interview[3]

---

[3] The trial court states in the findings of fact that A.E.M. and J.M.M. were interviewed in-chambers by the trial court judge on a different date from the trial date. In fact, the court's finding says the interviews were on "November 30, 2018," but that date post-dates the day of the trial court's ruling which was signed on July 6, 2018. We conclude the year is a typographical error. The appellate record does not include a transcript or recording of those interviews. *See* Tex. Fam. Code Ann. §§ 156.006 (in a modification suit, the trial court may render a temporary order that

27

Eleven-year-old K.J.M. told the judge that he lives with Mother and his stepdad. K.J.M. said that he last saw Father "[l]ike two months ago[]" when they "went to go eat and stuff[,]" and A.E.M. went with Mother. He described the visit as "[o]kay." K.J.M. told the judge that he was scared about visiting with Father because he was afraid Father "would get mad at me because I want to live with my mom." K.J.M. described his relationship with his Father as "[b]ad. . . . [b]ecause he's mean all the time." According to K.J.M., he is "scared, whenever I see [Father] hit [J.M.M.] really hard. . . . So[,] whenever he hits [J.M.M.]; I get scared because I think he is going to hit me next." K.J.M. told the judge that the last time something like that happened was sometime before the past school year.

---

changes the designation of the person who has the exclusive right to determine the child's primary residence under the final order if the temporary order is in the best interest of the child and the child is twelve years of age or older and has expressed to the court in chambers as provided by Section 153.009 the name of the person who is the child's preference to have the right to designate the primary residence of the child); 156.101 (trial court can modify an order establishing conservatorship or possession and access if the modification is in the best interest of the child and the child is twelve years of age or older and has expressed to the court in chambers as provided by Section 153.009 the name of the person who is the child's preference to have the right to designate the primary residence of the child). In a family law case involving unrecorded in-camera interviews with minors, when a party fails to request a recording of the interview, we presume the evidence is sufficient to support the judge's findings. *See Long v. Long*, 144 S.W.3d 64, 69 (Tex. App.—El Paso 2004, no pet.) (citing *Voros v. Turnage*, 856 S.W.2d 759, 763 (Tex. App.—Houston [1st Dist.] 1993, writ denied)).

## Standard of Review

We review a trial court's decision to modify a conservatorship order for an abuse of discretion. *Epps v. Deboise*, 537 S.W.3d 238, 242 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Arredondo v. Betancourt*, 383 S.W.3d 730, 734 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (stating that courts review orders modifying conservatorship for abuse of discretion because trial courts have broad discretion to decide best interest of the child in family law matters). A trial court's modification decision will only be disturbed on appeal when it is clear that the trial court acted in an arbitrary or unreasonable manner, without reference to any guiding rules or principles. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied) ("The mere fact that a trial court decided an issue in a manner differently than an appellate court would under similar circumstances does not establish an abuse of discretion.").

Under the abuse of discretion review, legal and factual sufficiency of the evidence are not independent grounds of error but are instead factors to be used in assessing whether the trial court abused its discretion. *Arredondo*, 383 S.W.3d at 734. There is no abuse of discretion if some evidence of a substantive and probative character exists to support the trial court's decision. *Stamper*, 254 S.W.3d at 542.

When an appellant challenges legal and factual sufficiency of the evidence in the case where the standard is an abuse of discretion, we must determine whether the trial court (1) had sufficient information upon which to exercise its discretion and (2) erred in its application of discretion. *Id.*; *Zeifman*, 212 S.W.3d at 588. When conducting a legal-sufficiency review, we determine whether the evidence would enable reasonable people to reach the judgment being reviewed. *Stamper*, 254 S.W.3d at 542 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We consider favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* If the evidence would enable reasonable and fair-minded people to differ in their conclusions, the factfinder must be allowed to do so, and we cannot substitute our judgment for that of the factfinder if the evidence falls within this zone of reasonable disagreement. *Epps*, 537 S.W.3d at 243.

In conducting a factual-sufficiency review, we consider all the evidence that supports and contradicts the factfinder's determination. *Id.* We may set aside a verdict only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Id.* The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* When considering whether the trial court erred in its application of discretion, we

must determine whether, based on the evidence presented, the trial court made a reasonable decision. *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex. App.—El Paso 1998, no pet.). The trial court is in a better position to decide custody cases because "'it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent.'" *In re J.J.G.*, 540 S.W.3d 44, 56 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)).

Material and Substantial Change in Circumstances

In issue two, Mother argues the trial court abused its discretion by modifying the existing order because evidence did not demonstrate a material and substantial change in circumstances since rendition of the prior order. According to Mother, Father "failed to present evidence showing what conditions existed at the time of the entry of the prior order as compared to the circumstances existing at the time of the hearing on the motion to modify[,]" and "[t]estimony did not demonstrate the conditions that existed at the time of the entry of the prior order."

A court that has continuing, exclusive jurisdiction may modify an order that provides for the conservatorship, support, or possession of and access to a child. Tex. Fam. Code Ann. § 155.003(a). Section 156.101 of the Family Code sets out the grounds for modifying a conservatorship order:

31

(a) The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:

> (1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:

>> (A) the date of the rendition of the order; or

>> (B) the date of the signing of a mediated or collaborative law settlement agreement on which the order is based[.]

*Id.* § 156.101(a); *Epps*, 537 S.W.3d at 243. "The change-in-circumstances requirement is a threshold issue for the trial court and is based on a policy of preventing constant re-litigation with respect to children." *Smith v. Karanja*, 546 S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("In an effort to ensure stability and continuity for children, Texas law has imposed 'significant hurdles' before a conservatorship order may be modified."). Unlike termination of parental rights cases in which the statutory grounds for termination must be established by clear and convincing evidence, the standard of proof for a conservatorship decision is preponderance of the evidence. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

"Determination of a substantial and material change is not controlled by a set of guidelines; instead, it is fact specific." *Epps*, 537 S.W.3d at 243. Some examples of material and substantial changes include (1) remarriage by a party, (2) poisoning

32

of the child's mind by a party, (3) change in the home surroundings, (4) mistreatment of the child by a parent or step-parent, and (5) a parent's becoming an improper person to exercise custody. *Smith*, 546 S.W.3d at 741; *In re A.L.E.*, 279 S.W.3d at 428-29 (noting that this list of material changes is "non-comprehensive"). "Changes in a child's home surroundings or circumstances rendering a conservator unsuitable are examples of the material and substantial changes contemplated by section 156.101(a)(1)." *In re J.R.P.*, 526 S.W.3d 770, 779 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

When both parties allege in counter-petitions that there has been a material and substantial change in circumstances since the last order and both seek a modification of that order, the allegations constitute a judicial admission that there has been a material and substantial change in circumstances since the last order. *In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.) (citing *Delaney v. Scheer*, No. 03-02-00273-CV, 2003 Tex. App. LEXIS 1080, at **13-15 (Tex. App.—Austin Feb. 6, 2003, no pet.) (mem. op.)) ("One party's allegation of changed circumstances of the parties constitutes a judicial admission of the common element of changed circumstances of the parties in the other party's similar pleading."). "Admissions in trial pleadings are regarded as judicial admissions" in the case and require no proof of the admitted fact, and "authorize the introduction of

no evidence to the contrary." *In re L.C.L.*, 396 S.W.3d 712, 718 (Tex. App.—Dallas 2013, no pet.) (citing *Thompson v. Thompson*, 827 S.W.2d 563, 566 (Tex. App.—Corpus Christi 1992, writ denied)). Accordingly, we conclude that the trial court could have reasonably concluded that there had been a material and substantial change in circumstances since the last order.[4]

To modify a conservatorship order, the party seeking modification must also establish that the modification is in the best interest of the child. *See Epps*, 537 S.W.3d at 243. In determining the best interest of the child, courts consider the following non-exclusive factors:

> (1) the desires of the child;
> (2) the emotional and physical needs of the child now and in the future;
> (3) the emotional and physical danger to the child now and in the future;
> (4) the parental abilities of the individual seeking custody;
> (5) the programs available to assist the individual to promote the best interest of the child;
> (6) the plans for the child by the individual or by the agency seeking custody;
> (7) the stability of the home or proposed placement;
> (8) the acts or omissions of the parent, or potential conservator, that may indicate that the existing relationship is not a proper one; and
> (9) any excuse for the acts or omissions of the parent or potential conservator.

---

[4] Because we have determined that the parties judicially admitted that there had been a material and substantial change in circumstances since the entry of the prior custody orders, we need not address Mother's argument that Father failed to establish the conditions that existed at the time of the entry of the prior order. *See* Tex. R. App. P. 47.1.

34

*Mauldin v. Clements*, 428 S.W.3d 247, 269 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976)). These factors are not exhaustive, and it is not a requirement that evidence on all factors be present in every case. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (stating, in the context of parental rights, that there is no requirement that all of *Holley* factors be proved as condition precedent for termination of rights); *In re A.L.H.*, 515 S.W.3d 60, 79 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stating, in the context of modification case, that evidence is not required on every *Holley* factor to support modification).

The trial court heard Shelby Smith, K.J.M.'s principal, testify that K.J.M. has missed thirty-one days out of the ninety-eight days of school from the time of his enrollment in November 2017. Smith testified that K.J.M. was not at school, and she had district police conduct a welfare check at Mother's house after Smith could not get in touch with family. Smith testified that even though she had communicated to Mother that K.J.M. needed to be in school in order to progress academically, Smith still had concerns about whether K.J.M. would attend. The trial court heard Smith testify that K.J.M. had three failing averages for the year, was absent for the writing STAAR, passed the reading STAAR, and failed the math STAAR. Smith testified that Father communicated with her regarding K.J.M.'s attendance and academics.

The trial court also heard Theresa Burbank testify regarding her therapy with A.E.M. and K.J.M. She testified that Father brought A.E.M. to therapy sessions starting in December 2017, that A.E.M. was progressing while living with Father, that Mother only attended two joint therapy sessions with A.E.M. and would cancel sessions or fail to show up, that A.E.M. becomes emotional when Mother does not attend, that for scheduled joint sessions between Father and K.J.M. Mother would not bring K.J.M. or would cancel the appointment, that when Father brought K.J.M. for therapy K.J.M. appeared happy and excited to be with Father, and that after that visit Mother had not responded to Burbank or contacted Burbank regarding appointments.

The trial court heard Father's testimony that since the last modification in February 2014 he has told Mother that the children should be enrolled in school and that they had a lack of education, that he had concerns about J.M.M.'s medical condition because he was getting "worse[,]" that he had to take the children to the doctor because Mother did not, that Mother did not return K.J.M. after her weekend visit, that Mother was uncooperative in scheduling visits and showing up on time for visits, that now that A.E.M. has lived with Father she is thriving in school, that J.M.M. has not been in any program assisting him with his autism from the time of the prior order to the filing of this suit, that J.M.M. has made tremendous

improvement since Father got possession in 2017 and enrolled him in school, and that Mother did not attend the ARD meeting at J.M.M.'s school but Father did attend.

The trial court heard Mother's testimony which included allegations from Mother that Father had been abusive in the past and that Mother had been the primary caretaker for the children before the last modification. Mother agreed that K.J.M. had school attendance problems while he was living with her, that she did not show up to the first truancy hearing despite receiving the truancy paperwork, that K.J.M. missed school because she took him on a vacation that he "desperately needed" to St. John, and that she did not believe she had met the children's educational needs. Mother did not know the names of A.E.M.'s or J.M.M.'s teachers and Mother had failed to attend parent-teacher conferences for them, she had not taken K.J.M. back for his therapy sessions since March 28, she chose not to attend therapy sessions with A.E.M. despite her acknowledgement that A.E.M. needs help, and she did not attend dinner visits with A.E.M. in the months preceding trial.

The trial court heard testimony from Heidi Bassett, an instructional specialist with Humble ISD, who testified that Father has been receptive to the program where J.M.M. is now enrolled. Bassett testified that J.M.M. has made "great changes" since being enrolled including working with others, following directions, and reading aloud.

37

We conclude that there is some evidence in the record that supports the trial court's finding that a material and substantial change in circumstances justifying modification of the prior conservatorship had occurred, and some evidence that supports the trial court's finding that modification was in the children's best interest. *See* Tex. Fam. Code Ann. § 156.101(a); *Epps*, 537 S.W.3d at 243; *Smith*, 546 S.W.3d at 741; *In re A.L.E.*, 279 S.W.3d at 428-29. Issue two is overruled.

Appointment of Father as Sole Managing Conservator

In her first issue, Mother argues the trial court abused its discretion in designating Father as the sole managing conservator because Father has a history of domestic violence. First, she argues that pursuant to section 153.004(b) of the Texas Family Code, a trial court is prohibited from naming a party as a joint managing conservator if "credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child." Tex. Fam. Code §153.004(b). She also cites to section 153.004(f), which states that "[i]n determining under this section whether there is credible evidence of a history or pattern of past or present . . . abuse or family violence by a parent . . . the court shall consider whether a protective order was rendered under Chapter 85, Title 4 . . . against the parent or other person during the

two-year period preceding the filing of the suit or during the pendency of the suit."

*Id.* § 153.004(f). Mother alleged in her counter-petition that

> No protective order under title 4 of the Texas Family Code, under Chapter 7A of the Texas Code of Criminal Procedure, or an order for emergency protection under Article 17.292 of the Texas Code of Criminal Procedure is in effect, and no application for a protective order is pending with regard to the parties to this suit or the children of the parties to this suit.

Mother argues on appeal that "the trial court entirely ignored the well-documented pattern of physical abuse by [Father]" and "[t]he record has ample evidence of [Father]'s history and pattern of violence towards [Mother] and J.M.M. in the two years preceding the trial." In the alternative, she argues that even if this Court does not apply section 153.004, the trial court still abused its discretion in failing to apply section 156.1045(a) of the Texas Family Code.[5] In the trial, Father testified that when he was eighteen he was arrested for controlled substances, cocaine, that he pleaded guilty to a family violence charge in a criminal case, which he thinks was separate from a "protective order," and that he believed the family violence was in 2011 or 2012. Father also testified that he received a DWI in 2013 for which he received probation. Mother argues that pursuant to section 156.1045(a)

---

[5] Section 156.1045 is styled, "Modification of Order on Conviction for Family Violence." Tex. Fam. Code Ann. § 156.1045.

the "family violence" admission "would be sufficient to modify the existing order in favor of [Mother]."

Chapters 153 and 156 are distinct statutory schemes. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000). "The legislature did not express its intent to include the parental presumption or the section 153.004(b) domestic violence presumption in chapter 156 modification cases, although it did express its intent regarding modifications where a conservator has been convicted of child abuse or family violence." *In re S.E.K.*, 294 S.W.3d 926, 929 (Tex. App.—Dallas 2009, pet. denied) (citing Tex. Fam. Code Ann. §§ 156.104-.1045; *In re L.M.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at \*31 (Tex. App.—Austin 2005, no pet.) (mem. op.)). Section 156.1045, entitled "Modification of Order on Conviction for Family Violence" provides:

> (a) The conviction or an order deferring adjudication of a person who is a possessory conservator or a sole or joint managing conservator for an offense involving family violence is a material and substantial change of circumstances sufficient to justify a temporary order and modification of an existing court order or portion of a decree that provides for the appointment of a conservator or that sets the terms and conditions of conservatorship or for the possession of or access to a child to conform the order to the requirements of Section 153.004(d).

> (b) A person commits an offense if the person files a suit to modify an order or portion of a decree based on the grounds permitted under Subsection (a) and the person knows that the person against whom the motion is filed has not been convicted of an offense, or received

deferred adjudication for an offense, involving family violence. An offense under this section is a Class B misdemeanor.

Tex. Fam. Code Ann. § 156.1045. "When applicable, section 156.1045 dispenses with the requirement that [a] party prove an actual change in circumstances." *In re S.V.*, No. 05-12-00663-CV, 2014 Tex. App. LEXIS 9351, at \*18 n.10 (Tex. App.—Dallas Aug. 21, 2014, pet. denied) (mem. op.). Here, both parties judicially admitted that there had been a material and substantial change in circumstances since the entry of the prior custody orders. Mother's reliance upon section 156.1045(a) is inapplicable because Father's "family violence" was something that existed in 2011 or 2012, and it would have been  prior to the most recent 2014 Agreed Order in Suit to Modify Parent Child Relationship which is the most recent order Mother attempted to modify through her counter-petition.[6] In Mother's Counter-Petition to Modify Parent-Child Relationship, Mother alleged that "Counter-Respondent has a history of violence toward Counter-Petitioner and the minor children," and she

---

[6] The prior orders Mother sought to modify in her Counter-Petition were the Agreed Final Decree of Divorce rendered July 7, 2011, the February 25, 2014 Agreed Order in Suit to Modify Parent-Child Relationship, where the parties agreed that Mother and Father would remain joint managing conservators of the children, and the Order in Suit to Modify Parent Child Relationship rendered October 5, 2017. Father alleged in his Second Amended Petition that he wished to modify the Agreed Final Decree of Divorce rendered July 7, 2011, Agreed Order in Suit to Modify Parent-Child Relationship rendered on February 25, 2014, and Agreed Order in Suit for Modification of Support Order rendered on January 10, 2017.

sought orders from the trial court ordering Counter-Respondent to "refrain from the consumption of alcohol or a controlled substance within the twelve hours before or during the period of access to the children, and ordering Counter-Respondent to attend and complete a battering intervention and prevention program or, if such a program is not available, to complete a course of treatment with a mental health professional in accordance with section 153.010 of the Texas Family Code." Mother did not allege in her counter-petition that she was seeking a modification under section 156.1045. Based on the record now before us, it also appears that Mother did not present this argument to the trial court during the trial or in a post-trial brief or motion. Even if Mother had presented this argument to the trial court, we conclude that section 156.1045 "does not *compel* the trial court to modify an existing order" because "[i]n a modification proceeding, the best interest of the child must always be the trial court's primary concern." *See In re R.T.H.*, 175 S.W.3d 519, 522 (Tex. App.—Fort Worth 2005, no pet.). Also, as to Mother's contention that K.J.M.'s in-chambers interview does not support the trial court's appointment of Father as the children's sole managing conservator, the trial judge as the factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Epps*, 537 S.W.3d at 243. The trial court could have attributed some or no weight to the interview, and the trial court may have also discounted the in-chambers interview

of K.J.M. in light of all of the other evidence presented at the trial, as well as the interviews with the other children.

Mother does not raise a separate issue challenging the trial court's finding that the appointment of Father as sole managing conservator was in the children's best interest. To the extent, if any, that her brief can be interpreted to challenge the best-interest finding, giving the trial court due deference as the finder of fact in this case, we cannot say the trial court abused its discretion in modifying the prior order and in appointing Father the children's sole managing conservator, and in finding that the modification was in the best interest of the children. *See Epps*, 537 S.W.3d at 242-43. Issue one is overruled.

Denial of Motion for Continuance

In issue three, Mother argues the trial court abused its discretion when it denied her motion for continuance. According to Mother, she sought a motion for continuance because Father filed his Second Amended Petition twelve days prior to trial, and she needed more time to conduct discovery and find witnesses related to new information in Father's amended petition.

An appellate court will not reverse a judgment based on a denial of a motion for continuance absent a clear abuse of discretion. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Snider v. Stanley*, 44 S.W.3d 713,

718 (Tex. App.—Beaumont 2001, pet. denied). An abuse of discretion occurs when the trial court "'reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Marchand*, 83 S.W.3d at 800 (quoting *Johnson v. Fourth Ct. of App.*, 700 S.W.2d 916, 917 (Tex. 1985)).

Rule 251 of the Texas Rules of Civil Procedure requires a party seeking a continuance to show sufficient cause by affidavit, consent of the parties, or operation of law as support for the motion. Tex. R. Civ. P. 251. "A motion for continuance must be in writing, state the specific facts supporting the motion, and be verified or supported by an affidavit." *Serrano v. Ryan's Crossing Apartments*, 241 S.W.3d 560, 564 (Tex. App.—El Paso 2007, pet. denied). Mother's *oral* request for continuance was not supported by affidavit. The motion for continuance did not comply with Rule 251, and we cannot say the trial court abused its discretion in denying the motion. *See Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986) (Failure to comply with rule 251 creates a rebuttable presumption that the trial court did not abuse its discretion in denying a motion for continuance.); *Metro Aviation, Inc. v. Bristow Offshore Helicopters, Inc.*, 740 S.W.2d 873, 874 (Tex. App.—Beaumont 1987, no writ) ("When the provisions of rule 251 have not been satisfied, it will be presumed that the trial court did not abuse its discretion in denying a continuance."). Issue three is overruled.

## Admissibility of Exhibit P-6

In her fourth issue, Mother argues the trial court abused its discretion when it admitted Exhibit P-6. According to Mother, the exhibit "purported to be text messages between the parties when they were in fact not text messages[,]" the messages were "from a computer program and . . . were simply screen shots[,]" and the exhibit was admitted in violation of rule 901 of the Texas Rules of Evidence. Mother contends that the trial court committed reversible error in admitting the exhibit because the exhibit "was one of the considerations the trial court used for finding that it was in the best interest of the children to grant [Father] sole managing conservatorship[]" and caused "significant harm[.]"

We review a trial court's evidentiary rulings under an abuse of discretion standard. *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 261 (Tex. 2005). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). Authentication simply means that "an item is what it is claimed to be." *Id.* 901(b)(1). Father testified that he typically communicated with Mother through text messages, that he recognized Exhibit P-6 as text messages he sent to Mother and received from Mother, and that the exhibit would aid the trial court in understanding Father's testimony. Based on the record

before the trial court, we cannot say it was outside the zone of reasonable disagreement for the trial court to conclude that the exhibit was sufficiently authenticated or to overrule the objection and admit the exhibit into evidence. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). Additionally, even if the trial court erred in admitting the exhibit, Mother has not shown that the trial court's decision turned on the complained-of evidence. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004) ("We review the entire record[] and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted.") We also note that the complained-of evidence was cumulative of Father's testimony about the same text exchange. *See id.* (erroneously admitted evidence is harmless if the evidence is merely cumulative). Mother has failed to establish that the alleged error by the trial court probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* Tex. R. App. P. 44.1(a). Issue four is overruled.

Having overruled all of Mother's issues, we affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

46

Submitted on September 17, 2019
Opinion Delivered February 20, 2020

Before McKeithen, C.J., Kreger and Johnson, JJ.